IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| KROLL (HK) LIMITED, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| | ) |
| v. | )   No. 20-cv-2880 |
| | ) |
| POPE INVESTMENTS, LLC; POPE | ) |
| ASSET MANAGEMENT, LLC; and | ) |
| WILLIAM P. WELLS, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This is a contract case. Before the Court is Plaintiff Kroll (HK) Limited's March 24, 2023 Motion for Summary Judgment. (ECF No. 39.) Kroll, hereinafter referred to by its prior name of "Borrelli Walsh," seeks judgment against Defendants Williams Wells and Pope Investments, LLC ("Pope"). (Id. at 1.) Pope and Wells responded on April 21, 2023 and filed a corrected response on April 24. (ECF Nos. 42, 48-52.) Borrelli Walsh timely replied. (ECF Nos. 53-54.) The issues are now properly before the Court, and the Motion is ripe for decision.

## I. Background

William Wells is the president of Pope Asset Management, LLC, a private fund which manages the portfolios of wealthy individuals as well as other investments. (ECF No. 54 at ¶ 2;

No. 49 at ¶ 2.) Pope Asset Management is the managing member of Pope, which is a single-purpose entity created to invest in China Alarm Holdings Ltd. ("China Alarm"). (ECF No. 54 at ¶ 2.) Pope invested a substantial sum in China Alarm, a company led by Alex Ing. (Id. at ¶ 3; ECF No. 49 at ¶¶ 5-6.) The investment fared poorly, and the matter ended when a Hong Kong court entered judgment for Pope and against Ing for more than $10 million. (ECF No. 54 at ¶ 3; No. 49 at ¶ 8.)

After successfully petitioning the Hong Kong court to declare Ing bankrupt, Wells turned to Borrelli Walsh to help recover the debt Ing owed. (ECF No. 13 at ¶¶ 11, 13; see also No. 48 at 6.) In an August 14, 2019, email to Cosimo Borrelli, a managing director at Borrelli Walsh, Wells said that "[w]e have finally got the order to put Alex [Ing] into bankruptcy. Can you outline how this works as to process and your fees?" (ECF No. 1-5.)

In his reply, Borrelli explained that Pope, as Ing's creditor, would need to contact the Hong Kong authorities to nominate a trustee of Ing's estate. (Id.) Borrelli went on:

> I am unable to provide you with a sensible estimation of our fees at this stage. The information currently available does not allow me to establish a precise and detailed work scope for this bankruptcy given that Alex has had ample time to squirrel his assets away -- I strongly suspect that he has had asset protection measures in place for many years. As the starting point, we will likely need to get his banking, tax and similar records over the last 7 years directly from

the relevant sources (including banks, tax office, his accountants and the like) and conducting [sic] searches and investigations in order to trace the observable connections.

In the circumstances, I propose a fixed fee structure for the first 60 days with a further appropriate fee structure to be agreed following the work undertaken during the first 60 days and the adoption of an appropriate strategy. For the first 60 days after we are appointed as the trustee, we propose:
1. calculating our fees using the hourly rates approved by the [Hong Kong authorities] for the work required;
2. capping our fees at a maximum of US$100,000; and
3. should our fees nor [sic] reach the above limit in the 60 day period, you will be invoiced the lower amount.

(Id.) Wells agreed, saying that he would "push the lawyers to get moving on the letter" to the Hong Kong authorities nominating Borrelli as trustee. (Id.) The parties agree that this exchange of emails formed a valid and enforceable contract between Borrelli Walsh and Pope, although they disagree about whether Wells, in his personal capacity, was a party to the contract. (ECF No. 13 at ¶ 15.)

Borrelli and his colleague, Jacqueline Walsh, were subsequently appointed trustees of Ing's bankruptcy estate. (ECF No. 1 at ¶ 19; No. 13 at ¶ 19.) Although the volume and quality of Borrelli Walsh's work to track down Ing's assets is in dispute, it is not disputed that Borrelli Walsh was in regular communication with Pope and Wells, with at least thirty-one emails exchanged between Borrelli or Walsh and Wells during the

3

sixty-day period provided under the contract. (ECF No. 1 at ¶¶ 20-21; No. 13 at ¶¶ 20-21.) Borrelli Walsh ultimately did not recover any of Ing's assets. (ECF No. 1 at ¶ 22; No. 13 at ¶ 22.) At the end of the sixty-day period, Borrelli Walsh sent Pope an invoice for $112,171, consisting of fees capped at $100,000 and $12,171 in expenses.[1] (ECF No. 1 at ¶ 23; No. 13 at ¶ 23; No. 1-6.) Pope never paid. (ECF No. 13 at ¶¶ 25-26.)

Borrelli Walsh filed the instant suit on December 7, 2020. (ECF No. 1.) The complaint alleged breach of contract by Pope and Wells in Count 1 and a corporate veil-piercing theory against Wells and Pope Asset Management in Count 2. (Id. at ¶¶ 33, 48.) On motion, the Court dismissed Count 2, but declined to dismiss Count 1 as to Wells. (ECF No. 25 at 10.) Borrelli Walsh's breach of contract claim is the sole issue before the Court.

## II. Jurisdiction and Choice of Law

This Court has diversity jurisdiction under 28 U.S.C. § 1332. At the time of the filing of this suit, Borrelli Walsh was a private limited company incorporated and based in Hong Kong. (ECF No. 1 at ¶ 6; No. 13 at ¶ 6.) Wells is a resident of Tennessee. (ECF No. 1 at ¶ 9; No. 13 at ¶ 9.) Pope and Pope Asset Management are both limited liability companies whose members

---

[1] The email from Borrelli to Wells proposing a fee structure also stated "[y]ou will need to make an allowance for our out of pocket expenses such as any searches and travels." (ECF No. 1-5.)

are all citizens of Tennessee. (ECF No. 25 at 4.) Because complete diversity existed between the parties at the time of filing and the amount in controversy exceeds $75,000, the Court has jurisdiction.

State substantive law applies to state law claims brought in federal court. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Where there is no dispute that a certain state's substantive law applies, the court will not conduct a choice of law analysis sua sponte. See GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998); Wiener v. AXA Equitable Life Ins. Co., 58 F.4th 774, 785 (4th Cir. 2023) (reversing district court for raising choice of law issue sua sponte); Williams v. BASF Catalysts LLC, 765 F.3d 306, 316 (3d Cir. 2014) ("All U.S. Courts of Appeals to have addressed the issue have held that choice-of-law issues may be waived.").

Borrelli Walsh, in its summary judgment briefing, relies on Tennessee law. (ECF No. 40 at PageID 159, 163.) Pope and Wells cite primarily Tennessee cases, but also make arguments based on the alleged existence of certain fiduciary duties under Hong Kong law. (ECF No. 48 at PageID 242-44.) Based on Wells and Pope's briefing, they believe the contract is governed by Tennessee law. They cite Tennessee cases for the propositions that contractual words are to be given their ordinary meaning; that a contract's meaning is ambiguous when it can be construed

in more than one way; and that courts should look to the facts and circumstances surrounding the contract's execution to give meaning to an ambiguous contract. (Id. at PageID 242-43.) In contrast to these Tennessee authorities dealing with how contracts are to be interpreted and applied, Defendants' citation to Hong Kong law addresses the existence of a fiduciary duty based not on a contract, but on Borrelli and Walsh's individual status as trustees of the bankruptcy estate. (Id. at PageID 244.) Defendants thus acquiesce to the Court's interpretation of the contract under Tennessee law.[2]

## III. Standard of Review

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can meet this burden by showing that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of its case. Fed. R. Civ. P. 56(c)(1); Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018).

---

[2] Defendants have waived any argument the contract should be interpreted under Hong Kong law, both because they have failed to explicitly argue as much and because, by citing only one foreign source of authority, they have failed to provide any adequate means by which this Court could determine the requirements of Hong Kong law.

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" EEOC v. Ford Motor Co., 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting Chappell v. City of Cleveland, 585 F.3d 901, 913 (6th Cir. 2009)). The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Adcor Indus., Inc. v. Bevcorp, LLC, 252 F. App'x 55, 61 (6th Cir. 2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

The nonmoving party must point to concrete evidence on which a reasonable juror could return a verdict in its favor; a district court will not "wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989); accord Parker v. Winwood, 938 F.3d 833, 839 (6th Cir. 2019); Fed. R. Civ. P. 56(c)(3).

"In assessing the record to determine whether there is any genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." Wathen v. Gen. Elec. Co., 115 F.3d 400, 403 (6th

Cir. 1997). Courts will not, however, draw strained or unreasonable inferences. Audi AG v. D'Amato, 469 F.3d 534, 545 (6th Cir. 2006).

Although summary judgment must be used carefully, it "is 'an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action' rather than a 'disfavored procedural shortcut.'" FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).

## IV. Analysis

### A. Defendants Breached the Contract.

To establish a breach of contract, a litigant must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." Fed. Ins. Co. v. Winters, 354 S.W.3d 287, 291 (Tenn. 2011). Where a valid contract exists, its interpretation is a question of law to be decided by the court. Barnes v. Barnes, 193 S.W.3d 495, 498 (Tenn. 2006). If a contract is unambiguous, "the literal meaning controls the outcome of the dispute." Maggart v. Almany Realtors, Inc., 259 S.W.3d 700, 704 (Tenn. 2008). "In such a case, the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" Id. (quoting Bob

<u>Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.</u>, 521 S.W.2d 578, 580 (Tenn. 1975)). Courts should consider the entire agreement, giving reasonable effect to all of its provisions. <u>Id.</u>

Pope concedes, in its answer, that the emailed fee proposal sent by Borrelli to which Wells agreed is a valid contract by which Pope is bound.[3] (ECF No. 13 at ¶ 15.) Pope and Wells dispute, however, whether Wells was a party to the contract. (<u>Id.</u>) Wells contends he agreed to the contract only in a representative capacity on behalf of Pope. (<u>Id.</u>)

Whether a signatory to a contract assented in his individual or representative capacity "must be determined from the contract itself." <u>MLG Enters., LLC v. Johnson</u>, 507 S.W.3d 183, 186 (Tenn. 2016) (emphasis removed) (quoting <u>Lazarov v. Klyce</u>, 255 S.W.2d 11, 14 (Tenn. 1953)). Neither the August 14, 2019 fee proposal nor other emails exchanged between Wells and Borrelli immediately before or after specifically stated whether Pope, Wells as an individual, or both were parties to the agreement. (ECF No. 1-5.)

---

[3] Borrelli Walsh argues that Wells admitted he was a party to the contract because he failed to file an answer to Borrelli Walsh's complaint, which alleged that Wells was party to the contract. (ECF No. 40 at PageID 162-63; No. 1 at ¶ 15.) Wells responds that, although Wells' name was inadvertently omitted, Pope's answer responded on his behalf and clearly denied that Wells was a party. (ECF No. 48 at PageID 246-47; <u>see</u> No. 13 at ¶ 15.) Because Wells is a party to the contract regardless, the Court need not decide whether Pope can answer on Wells' behalf.

Wells' email agreeing to the fee proposal and stating that he would "push the lawyers to get moving on the letter" nominating Borrelli as trustee was signed "Bill[.]" (Id.) Another email from Wells in the same exchange was also signed "Bill[.]" (Id.) There is no signature block mentioning Pope, no language denoting a representative role (such as "as" or "by"), and no mention of Wells' title at Pope. (Id.)

Wells' subscription of his own name with no elaboration or adornment indicates that he agreed to the contract in his capacity as an individual. It is well-established that "the signature of an individual, 'without limiting or descriptive words before or after it, is the universal method of signing a contract to assume a personal obligation.'" Hight v. Tramel, No. M2019-00845-COA-R3-CV, 2020 Tenn. App. LEXIS 511, at *16 (Ct. App. Nov. 17, 2020) (quoting Associated Shopping Ctr. Props., Ltd. v. Hodge, No. M2010-00039-COA-R3-CV, 2011 Tenn. App. LEXIS 138, at *16 (Ct. App. Mar. 22, 2011)).

Tennessee courts have enforced contracts against individuals who signed under their own names, even where there were some indicia that the signer was acting in a representative capacity. See Garland v. Bonner, No. 01A01-9710-CV-00570, 1998 Tenn. App. LEXIS 239, at *4-5 (Ct. App. Apr. 8, 1998) (enforcing contract against individual who signed his name followed by the word "seller"); Lazarov, 255 S.W.2d at 12, 15 (enforcing

promissory note against corporate officer individually where he signed without any language to denote his representative capacity, even though another corporate officer signed "By [name]"); DeWitt v. Al-Haddad, No. 89-394-II, 1990 Tenn. App. LEXIS 289, at *21-22 (Ct. App. Apr. 25, 1990) (finding individual was party to contract based on unadorned signature even where body of contract listed signer's corporation under his name).

The Sixth Circuit has similarly recognized that a "signature on a note, without any limiting or descriptive language before or after it, clearly shows the assumption of a personal obligation, and the subjective intent of the maker is irrelevant." FDIC v. Armstrong, 784 F.2d 741, 744 (6th Cir. 1986); see also id. (affirming grant of summary judgment based on signature).

Because Wells' email message agreeing to the contract was signed under his own name, and because both the signature block and the entirety of the email exchange were devoid of any reference to Pope, Wells manifested a willingness to be bound in his personal capacity. Wells is thus a party to the contract.[4]

---

[4] For the same reasons that Wells is a party to the contract -- namely, that Wells' name and signature, and not Pope's, appear in the email assenting to the contract -- one could doubt whether Pope is properly a party to the contract. Because Pope does not dispute that it is a party, the Court will not pursue the issue.

Given that there was a contract between Borrelli Walsh and Defendants, the remaining issues are breach and damages. It is undisputed that Borrelli Walsh sent Defendants an invoice for $112,171 and that Defendants have refused to pay. (ECF No. 1 at ¶¶ 23-26; No. 13 at ¶¶ 23-26; No. 1-6.) A complete failure to pay amounts due is a material breach of contract. See, e.g., Xerox Corp. v. Digit. Express Graphic, LLC, No. M2006-02339-COA-R3-CV, 2008 Tenn. App. LEXIS 311, at *8-9, *13-14 (Ct. App. May 22, 2008). Although denying liability, Defendants do not dispute the specific amount of damages. (ECF No. 48.) Thus, there is no genuine dispute of material fact that Defendants breached the contract, causing damages of $112,171 to Borrelli Walsh.

**B. Defendants' Defenses Are Meritless.**

Defendants proffer two defenses in an attempt to evade liability. Neither is persuasive. Defendants first argue that Borrelli Walsh breached the contract by failing, after the contract's initial sixty-day exploratory period, to approach Pope with a strategy and accompanying fee structure for further efforts to recover Ing's assets. (ECF No. 48 at PageID 243-44.) Defendants point out that the contract between the parties provides for "a fixed fee structure for the first 60 days with a further appropriate fee structure to be agreed following the work undertaken during the first 60 days and the adoption of an appropriate strategy." (ECF No. 1-5.) Defendants contend that

12

Borrelli Walsh violated the contract by "fail[ing] to approach [Pope] with a fee proposal to pursue the recovery." (ECF No. 48 at PageID 244.)

Although not explicitly so labeled, Defendants' argument is a defense under the first-to-breach doctrine. Under that doctrine, a "party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." McClain v. Kimbrough Constr. Co., 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). Defendants effectively argue that Borrelli Walsh breached first by refusing to negotiate a strategy to further pursue Ing's assets, so that Borrelli Walsh is not entitled to recover for Defendants' later nonpayment.

Tennessee courts have described the first-to-breach doctrine as an affirmative defense. Anil Constr., Inc. v. McCollum, No. W2013-01447-COA-R3-CV, 2014 Tenn. App. LEXIS 483, at *5 (Ct. App. Aug. 7, 2014); Servpro Indus., Inc. v. Pizzillo, No. M2000-00832-COA-R3-CV, 2001 Tenn. App. LEXIS 87, at *23 (Ct. App. Feb. 14, 2001).[5] Generally, the party asserting an affirmative defense bears the burden of proving it at trial. See, e.g., Cloyd v. Hartco Flooring Co., 274 S.W.3d 638, 647

---

[5] Allegations that another party was first to breach a contract may also be brought as a counterclaim. See Servpro, 2001 Tenn. App. LEXIS 87, at *6, *23-24.

13

(Tenn. 2008). Because Plaintiff has shown that -- absent a valid affirmative defense -- it is entitled to judgment as a matter of law on the breach of contract claim, Defendants now bear the burden of showing a genuine dispute of material fact that would support a jury verdict in their favor on the affirmative defense. See Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020); U.S. Specialty Ins. Co. v. N602DW, LLC, No. 3:16-cv-02092, 2017 U.S. Dist. LEXIS 166127, at *8-12 (M.D. Tenn. Oct. 5, 2017) (requiring nonmovants at summary judgment to point to evidence creating a genuine dispute of material fact where nonmovant bore burden of proof at trial).

Defendants must point to a dispute of facts (or undisputed facts in their favor) and a viable legal theory under which they would be entitled to avoid liability, assuming a jury found the disputed facts in their favor. See 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2727.2 (4th ed. Apr. 2023 update) ("[T]he showing of a genuine issue for trial is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." (internal quotation marks omitted) (quoting McGuire v. Columbia Broad. Sys., Inc., 399 F.2d 902, 905 (9th Cir. 1968))).

14

Defendants' argument that Plaintiff breached the contract first fails as a matter of law. The contract cannot be interpreted to contain a legally enforceable requirement that Borrelli Walsh participate in negotiations or make any particular fee proposal after the initial sixty-day period. Such an interpretation would not be reasonable. Courts must "adopt a sensible meaning and construe a [contract] to avoid absurd consequences." Vill. E. Ass'n v. Lamb, No. E2017-02275-COA-R3-CV, 2018 Tenn. App. LEXIS 549, at *5-6 (Ct. App. Sept. 19, 2018) (alteration in original) (quoting Hughes v. New Life Dev. Corp., 387 S.W.3d 453, 469 (Tenn. 2012)). A legally enforceable requirement of additional negotiations is not sensible because the initial sixty-day investigation might well have shown -- and indeed, evidently did show -- that Ing had no assets reasonably within reach. (See ECF No. 40 at PageID 158.) A supposition that the contract creates an enforceable requirement of further negotiations is also contradicted by the complete absence in the contract of any rules, requirements, or guidelines that might govern those negotiations. (See ECF No. 1-5.) It is not reasonable to posit that Borrelli Walsh intended to condition its entitlement to payment for completed work on a vague negotiation requirement without concrete means for Borrelli Walsh to determine its compliance.

A more reasonable interpretation is that the reference to further negotiations after the initial sixty-day period was a clarification of what the contract did not cover. That is, the provision mentioning additional negotiations provides that any work done after the first sixty days was not covered by the contract and would be subject to further negotiations. Because Defendants' interpretation of the contract as creating an enforceable requirement of further negotiations is unreasonable, that interpretation cannot serve as a defense or excuse for Defendants' nonpayment.

Defendants' second defense for nonpayment is Cosimo Borrelli and Jacqueline Walsh's alleged breach of their fiduciary duties as bankruptcy trustees under Hong Kong law. (ECF No. 48 at PageID 244-45.) Defendants cite section 84(1) of the Hong Kong Bankruptcy Ordinance, which provides that trustees "shall act in a fiduciary capacity and deal with property under their control honestly, in good faith, with proper skill and competence and in a reasonable manner." Bankruptcy Ordinance, (1996) Cap. 6 § 84(1) (H.K.). Defendants argue that Borrelli and Walsh violated their fiduciary duties by refusing to step down as trustees on Defendants' request and by failing to pursue other means of recovering Ing's asserts, such as seeking to depose him. (ECF No. 48 at PageID 244-45.)

Defendants do not provide sufficient briefing on Hong Kong law for the Court to conclude that Borrelli and Walsh violated their fiduciary responsibilities.[6] The text of the Bankruptcy Ordinance mentions only a general fiduciary duty and an obligation to deal responsibly with property in the trustee's custody. Because it is undisputed that Borrelli and Walsh never recovered any assets from Ing, there was no property in the bankruptcy estate that they could have mismanaged. (See ECF No. 49 at PageID 251.) Defendants can therefore rely only on the Hong Kong Bankruptcy Ordinance's very general statement that trustees "shall act in a fiduciary capacity." Bankruptcy Ordinance, (1996) Cap. 6 § 84(1) (H.K.). The Hong Kong ordinance does not say or clearly imply that trustees must pursue every available pathway to recover a debt or must step down immediately on a creditor's request.[7] Defendants cite no cases for those propositions. (See ECF No. 48.) Indeed, Defendants do not cite a single case, from Hong Kong or otherwise, addressing what a trustee's fiduciary duty requires or how it has been applied.

---

[6] Although Defendants do not explicitly address the issue, the Court will assume, for the sake of argument, that a breach of fiduciary duty under Hong Kong law could serve as a defense to a related breach of contract action under Tennessee law.

[7] The immediately subsequent portion of the ordinance provides that, upon a creditor's complaint, the Hong Kong court may "inquire into the matter and take such action thereon as may be deemed expedient." Bankruptcy Ordinance, (1996) Cap. 6 § 84(1) (H.K.). This suggests that the removal of a trustee is a matter for the court and not automatically required on a creditor's request.

(Id.) Defendants are unable to establish a genuine dispute of material fact about whether Borrelli and Walsh violated their fiduciary obligations under Hong Kong law.

Defendants' failure to cite relevant authorities has also prejudiced Plaintiff by preventing it from responding to Defendants' argument with its own citations to and arguments under Hong Kong law. Whether Borrelli and Walsh complied with their fiduciary duties is forfeited. See D.S. ex rel. R.S. & E.S. v. Knox Cnty., No. 3:20-cv-240, 2021 U.S. Dist. LEXIS 251103, at *40 (E.D. Tenn. June 21, 2021) (denying portion of motion for judgment on agency record because "counsel's cursory briefing is insufficient to warrant relief"); see also id. ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alterations in original) (quoting McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997))); cf. Blue Grp. Res., Inc. v. Caiman Energy, LLC, No. 2:11-cv-648, 2013 U.S. Dist. LEXIS 102081, at *23-25 (S.D. Ohio July 22, 2013) (finding, where summary judgment movant pointed to evidence tentatively showing an entitlement to judgment and nonmovant failed to file a response, that summary judgment was appropriate); Brenay v. Schartow, 709 F. App'x 331, 337 (6th Cir. 2017) (stating that it

18

is "improper for the courts" to "flesh out the parties' arguments for them").

Even disregarding the inadequately briefed law, the undisputed facts highlight Defendants' inability to create a genuine dispute of material fact about whether Borrelli and Walsh violated a fiduciary duty. Borrelli Walsh submits an affidavit averring that, in addition to other tasks, it completed nearly three hundred hours of investigative work on Defendants' behalf, including obtaining Alex Ing's bank records, tracing his transactions, searching for properties he owned, determining whether he was involved in any legal proceedings, reviewing tax records, and so forth. (ECF No. 40-1 at PageID 166-67, 169; No. 1-6.) Although Defendants argue that Borrelli Walsh pursued a poor strategy, should have made claims against two particular companies, and should have deposed Ing, they do not dispute that Borrelli Walsh completed hundreds of hours of work on Defendants' behalf. (See ECF No. 49 at PageID 250-51.)

Defendants provide no specific information about when Borrelli and Walsh allegedly violated their fiduciary duties. Defendants' theory that the trustees violated their fiduciary duty falls apart if Borrelli Walsh's supposed failings were the result of Defendants' own refusal to pay for services rendered. Under Tennessee law (and Defendants cite no Hong Kong or other law to the contrary), a fiduciary is usually entitled to

compensation for its services. See In re Trust of Graham, No. M2021-00967-COA-R3-CV, 2022 Tenn. App. LEXIS 442, at *25 (Ct. App. Nov. 17, 2022); In re Hudson, 578 S.W.3d 896, 911 (Tenn. Ct. App. 2018); Restatement (Second) of Agency § 441 (Am. L. Inst. 1958). The contract between the parties clearly created an expectation of payment. (ECF No. 1-5.) It is undisputed that Defendants refused to pay. (ECF No. 13 at ¶ 26.) Borrelli Walsh was not required to work for free. See Restatement (Second) of Agency § 463 ("An agent whose principal violates . . . a contractual or restitutional duty to him . . . can, in a proper case . . . refuse to render further services.").

Defendants produce no evidence that Borrelli Walsh's alleged shortcomings, such as deciding not to depose Ing or refusing to resign as trustees, antedated Defendants' decision not to pay as required under the contract. Although facts must be construed and reasonable inferences made in favor of the nonmovant, Wathen, 115 F.3d at 403, it is also true that Defendants bear the burden of producing sufficient evidence to create a genuine dispute of material fact that would allow a jury to rule in their favor on the fiduciary duty defense, see U.S. Specialty Ins. Co., 2017 U.S. Dist. LEXIS 166127, at *8-12.

Defendants have failed to meet their burden. The available evidence in the record -- although limited -- suggests that Borrelli and Walsh's alleged violations of their fiduciary duties

occurred after Defendants refused to pay. Defendants submit a letter to Borrelli and Walsh, dated January 27, 2021, asking them to resign as bankruptcy trustees. (ECF No. 49-1 at PageID 266.) The wording of the letter, which states that "it is decided . . . to remove you as the trustees" and that "[y]ou are hereby requested" to convene a creditors' meeting to arrange for a replacement, suggests that the letter is the first, earliest request from Defendants asking Borrelli and Walsh to resign. (Id.) A February 5, 2021 email from Defendants' lawyer asking to be "advise[d] . . . asap whether will agree [sic] or not agree" with the request in the January 27 letter also suggests that Defendants had not previously asked Borrelli and Walsh to resign. (Id. at PageID 265.) Defendant Wells' affidavit does not provide a particular date for when Borrelli and Walsh were requested to resign and only vaguely states that the request was made after "Borrelli's document review, but prior to any further investigations." (ECF No. 49 at PageID 251.) The January 27, 2021 letter came not only after Borrelli Walsh's March 11, 2020 invoice, but also after the filing of this suit on December 7, 2020. (ECF Nos. 1, 1-6.)

Given the January 27 letter and the paucity of other evidence in the record, to presume that Defendants asked Borrelli and Walsh to resign before or even contemporaneously with Defendants' failure to pay would be a speculative, strained, and

21

unreasonable inference that is forbidden at summary judgment. See Audi AG, 469 F.3d at 545; Yellowbook Inc. v. Brandeberry, 708 F.3d 837, 848 (6th Cir. 2013) ("[T]he district court should not deny summary judgment on . . . speculative grounds.")

Defendants have also failed to produce evidence showing that Borrelli Walsh's other alleged failures, such as failing to depose Ing or to make claims against certain companies, were not the result of Defendants' nonpayment. (See ECF No. 49.) Given that Plaintiff has (absent a valid affirmative defense) established a breach of contract, the burden is on Defendants to come forward with some evidence that would create a genuine dispute of material facts about whether its affirmative defense of breach of fiduciary duty applies. Defendants' failure to do so is critical. Even disregarding Defendants' failure to brief Hong Kong law adequately, Defendants have not created a genuine dispute of material fact about whether Borrelli and Walsh violated any fiduciary duty.

Defendants have not established that Borrelli and Walsh violated any fiduciary duty. Defendants are thus without a valid defense, and Plaintiff is entitled to judgment as a matter of law.

### C. Plaintiff Should Be Granted Prejudgment Interest.

Plaintiff seeks an award of prejudgment interest. (ECF No. 40 at PageID 163.) Prejudgment interest is compensatory in

nature, aiming to make the plaintiff whole by accounting for the time value of money. See West Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease Litig.), 727 F.3d 473, 494-95 (6th Cir. 2013). An award of prejudgment interest is in the discretion of the district court and should be guided by principles of equity, although "a federal court sitting in diversity should use the state-law interest rate when awarding prejudgment interest." Id. at 494-95, 497. Tennessee law does not prescribe a specific rate, but instead permits the court to impose prejudgment interest "at any rate" not in excess of a particular maximum. See Tenn. Code Ann. § 47-14-123. In this case, the applicable maximum rate is ten percent.[8] Defendants have not responded to Plaintiff's request for prejudgment interest. (ECF No. 48.)

---

[8] Tennessee Code Annotated, section 47-14-123, provides that written contracts subject to section 47-14-103 will bear prejudgment interest at a maximum rate governed by the latter section. Section 47-14-103 provides that "all written contracts . . . signed by the party to be charged" and not subject to another, inapplicable section are subject to "the applicable formula rate." Tenn. Code Ann. § 47-14-103. The section containing statutorily defined terms points, in turn, to an administratively determined rate computed regularly based on prevailing market conditions. Tenn. Code Ann. § 47-14-102(3), (7). Although it may appear, from the statutory language, that the applicable maximum rate in this case should be the formula rate, Tennessee courts have held that contracts that do not provide for interest are controlled by the ten percent maximum in section 47-14-103(3), not the formula rate designated by 47-14-103(2). McNeil v. Nofal, 185 S.W.3d 402, 413-14 (Tenn. Ct. App. 2005); Raines Bros., Inc. v. Chitwood, No. E2013-02232-COA-R3-CV, 2014 Tenn. App. LEXIS 393, at *28-29 (Ct. App. July 3, 2014).

In exercising their discretion to decide the amount of an award of prejudgment interest, federal district courts in this state have frequently been guided by the statutory formula for postjudgment interest in 28 U.S.C. § 1961. Crystal Co. v. Caldwell, No. 1:11-CV-81, 2012 U.S. Dist. LEXIS 33213, at *33 (E.D. Tenn. Mar. 13, 2012); EEOC v. Wooster Brush Co. Emps. Relief Ass'n, 727 F.2d 566, 579 (6th Cir. 1984) (stating that district courts may be guided but are not bound by § 1961 in computing prejudgment interest). That statute applies as the rate of interest the "weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961. For the week of June 25, 2023, the weekly average rate was 5.346%. Bd. of Governors of the Fed. Rsrv. Sys., Data Download Program, https://www.federalreserve.gov/DataDownload/default.htm (last visited July 5, 2023) (from Data Download Program, select "Selected Interest Rates" and then download file pertaining to "Treasury Constant Maturities").

The Court finds that 5.346% is a fair rate and -- particularly given that the rate is reasonably commensurate with inflation rates in recent times -- fairly compensates the Plaintiff. See Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998) (discussing fairness and compensation to the plaintiff as factors to be considered). The amount of Defendants'

obligation is also certain, or at least fairly ascertainable, and the amount of the obligation (as opposed to whether the obligation exists in the first place) is not disputed by the parties. See id. The interest will be computed with a start date of thirty days after Borrelli Walsh's March 11, 2020 invoice. See Cook's Roofing, Inc. v. Hartford Underwriters Ins. Co., No. W2019-00271-COA-R3-CV, 2020 Tenn. App. LEXIS 318, at *48 (Ct. App. July 20, 2020) (stating trial court has discretion to choose time period over which prejudgment interest accrues); Mabey v. Maggas, No. M2006-02689-COA-R3-CV, 2007 Tenn. App. LEXIS 590, at *30 (Ct. App. Sept. 18, 2007) (same). Only simple interest will be imposed, as the Tennessee Supreme Court has interpreted section 47-14-123 to provide for simple (and not compound) interest. Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 447 (Tenn. 1992).[9]

**V. Conclusion**

For the foregoing reasons, Borrelli Walsh's Motion for Summary Judgment, ECF No. 39, is GRANTED. Borrelli Walsh is awarded $112,171, with prejudgment interest at the rate of 5.346% as provided in this Order.

---

[9] The Tennessee Supreme Court made this finding while interpreting section 47-14-123, not section 47-14-103, but the sections use similar language. Otis, 850 S.W.2d at 447.

SO ORDERED this 6th day of July, 2023.

/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE